IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ECHO ENERGY PARTNERS I, LLC | ) Case No. 20-31920 |
| | ) |
| Debtor. | ) |

**DECLARATION OF GREGG LASWELL, PROPOSED CHIEF RESTRUCTURING OFFICER OF DEBTOR, IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

I, Gregg Laswell, state as follows:

### I.   INTRODUCTION

1. I am the proposed Chief Restructuring Officer of Echo Energy Partners I, LLC, the debtor and debtor in possession (the "Debtor"). I am familiar with the Debtor's day-to-day operations, business affairs, books and records. The Debtor plans to shortly submit a motion seeking court approval to retain Opportune, LLC as restructuring advisor and for my appointment as Chief Restructuring Officer.

2. I submit this declaration (the "Declaration") to assist the Court and other parties-in-interest in understanding the circumstances that compelled the commencement of this chapter 11 case and in support of (i) the Debtor's voluntary petition for relief under chapter 11 of the Bankruptcy Code filed on March 24, 2020, (the "Petition Date") and (ii) the relief, in the form of motions, that the Debtor has requested of the Court (the "First Day Motions").[1]

3. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtor's management and the Debtor's other advisors, my review of relevant documents, or my opinion based upon my

---

[1] Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant First Day Motion.

#6124981

experience and knowledge of the Debtor's operations and financial condition. If I were called to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtor.

4. This Declaration is intended to provide a summary overview of the Debtor and this chapter 11 case. This Declaration describes the Debtor's business and the Debtor's debt, and summarizes the First Day Motions supported by this Declaration.

## II. DEBTOR'S BUSINESS

5. On the Petition Date, the Debtor filed a voluntary petition for relief under chapter 11, Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Court"). Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor is operating its business and managing its property as a debtor in possession. No trustees, committees or examiners have been appointed in this case. The Debtor filed a Notice of Designation as Complex Chapter 11 Bankruptcy Case contemporaneously with its petition.

6. The Debtor is a Delaware limited liability company that owns certain non-operated oil and gas interests and related assets. Echo Investment Partners, LLC ("EIP") is the sole member of the Debtor. The Debtor is managed by a board of managers, which consists of one manager – John T. Young, Jr. A more detailed Corporate Organization Chart is attached as **Exhibit A.**

7. The Debtor holds non-operating oil and gas interests in more than $700^2$ horizontally drilled producing wells in Oklahoma. The majority of these wells are in the natural gas-heavy Anadarko Basin.

---

[2] This number is net of interests in wells allegedly forfeited to Continental Resources, Inc. The Debtor does not consent to the validity of such alleged forfeiture and reserves all rights regarding same.

8. The Debtor has no employees. Non-affiliated operators (collectively, the "Third-Party Operators") manage the majority of the wells in which the Debtor owns an interest. The bulk of the Debtor's interests are governed by regulatory pooling orders and contractual pooling agreements (collectively, the "Pooling Agreements") with the Third-Party Operators. The Pooling Agreements entitle the Debtor to a share of production revenue, while also obligating the Debtor to pay a share of the well's expenses through monthly joint interest billings ("JIBs"). The Third-Party Operators' rights to payment are secured by remedies that include, among others: (i) placing liens on the leasehold and related interests owned by the Debtor; (ii) offsetting JIBs owed to the Third-Party Operators by revenue received from the applicable well and otherwise due to the Debtor; and, (iii) treating the Debtor's participatory working interests in applicable wells as non-participating interests.

9. The Debtor also engages two affiliated oil and gas operators. Echo E&P, LLC ("Echo E&P") provides contract operations for roughly 50 of the Debtor's wells, and personnel-manager Echo Energy, LLC ("Echo Energy," together with Echo E&P, the "Affiliated Operators") provides staffing services. Together, the Affiliated Operators manage all of the Debtor's obligations related to royalty owners, taxes, insurance, and other business necessities.

10. The Debtor's relationship with the Affiliated Operators is governed by a Service Agreement (the "MSA") dated January 19, 2018. Under the MSA, the Affiliated Operators provide certain services to the Debtor *at cost*, including: (i) general and administrative services, land administration, field operations, technical services, and the supervision of outside professionals provided by Echo Energy, and (ii) elections under operating agreements, the discharge of the Debtor's obligations under applicable operating agreements, and the marketing and sale of hydrocarbons provided by Echo E&P.

11.     Echo E&P bills the Debtor for services provided under the MSA on the 1st and 15th of each month.  Echo Energy bills Echo E&P for the services it provides at the Debtor's wells, and Echo E&P includes the cost of these services in the invoices it sends to the Debtor.  Each invoice contains a good faith estimate of all costs and expenses incurred by the Affiliated Operators in the two weeks preceding the date of the invoice.  The Debtor is responsible for paying those invoices within ten (10) days of receipt.  Amounts invoiced and paid in excess of what is spent by the Affiliated Operators are held in a bank account maintained by the Affiliated Operators and offset against the following period's invoice.  Additionally, the Affiliated Operators are entitled, under the MSA, to retain all production revenue and royalties during the payment term as an offset against the invoices due from the Debtor.

### III.  CAPITAL STRUCTURE

12.     The Debtor is a borrower under that certain Credit Agreement (together with related loan documents and as amended, restated, modified or supplemented, the "Pre-Petition Credit Agreement") with certain lenders party thereto and Texas Capital Bank, National Association, ("TCB"), as Administrative Agent and L/C Issuer (the "Pre-Petition Agent"), and TCB, as Sole Lead Arranger and Sole Book Runner, dated January 19, 2018.  There have been two amendments to the Pre-Petition Credit Agreement.  The First Amendment to the Pre-Petition Credit Agreement was effective on July 15, 2018.  The Second Amendment to the Pre-Petition Credit Agreement was effective on November 2, 2018.  In connection with the Pre-Petition Credit Agreement, the Debtor, on January 19, 2018, executed that certain Note in favor of the Pre-Petition Agent. The Pre-Petition Credit Agreement provides for revolving loans of up to a total of $250 million and letters of credit of up to a total of the greater of $5 million and the borrowing base thereunder, which limits availability under the Pre-Petition Credit Agreement.  As of the Petition Date, the borrowing base was $80 million, and at least $80 million in loans and advances were outstanding.

Prior to the Petition Date, the Debtor was in default under the Pre-Petition Credit Agreement and on March 13, 2020, the Pre-Petition Agent notified the Debtor of existing and continuing defaults and acceleration of all amounts due and owing.

13. Additionally, the Debtor's sole member, EIP, is a borrower under the certain agreement to purchase notes dated January 19, 2018, (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Note Purchase Agreement"), whereby certain financial institutions party thereto are holders, and HPS Investment Partners, LLC ("HPS") is the administrative agent. The Note Purchase Agreement, as amended, provides for an aggregate amount of $165 million of Notes to be sold and purchased. The Notes are secured by a senior secured first lien on all of EIP's right, title, and interest in all of the Equity Interests of the Debtor, the certificates representing the Membership interest, all rights to money or property of the Membership Interests which EIP had at the time of or acquired after the date of the Note Purchase Agreement, and all proceeds from the aforementioned collateral. On or about September 30, 2019, HPS exercised its rights pursuant to the pledge agreement associated with the Prepetition Note Purchase Agreement and assumed the right to exercise voting and other consensual rights formerly associated with EIP's sole equity interest in the Debtor.

### IV.  EVENTS LEADING TO CHAPTER 11 FILING

14. The Debtor has faced significant financial challenges brought on by sustained low natural gas prices and tightening liquidity markets. In mid-2018, with the benchmark Henry Hub natural gas price hovering near $3.00 per million Btu, the Debtor realized it would need additional liquidity to fund capital and operations expenditures to its Affiliated and Third-Party Operators through JIBs. The Debtor had some initial success and was able to access capital to maintain operations. However, as natural gas prices fell further in 2019 and production remained flat, the

Debtor recognized that additional liquidity would be required to maintain operations in the normal course of business.

15. Despite reaching out to more than a dozen banks and other lenders in late 2019 and early 2020, deteriorating market conditions precluded the Debtor from securing either sufficient prepetition debt financing or additional investment from its equity investors. As benchmark natural gas prices plummeted to below $2.50 per million Btu, energy lenders began to tighten credit and the broader marker market undertook an industry-wide revaluation of energy assets based on assumptions that prices would remain lower for longer. In September of 2019, as a result of Debtor's deteriorating finances, HPS exercised its right under the Prepetition Note Purchase Agreement to assume the equity voting rights that the Debtor's parent, EIP, had pledged to HPS as part of the Prepetition Note Purchase Agreement financing.

16. In early 2020, the Debtor maintained its search for additional liquidity but continued to be stymied by worsening market conditions. Natural gas prices continued to trend lower—by January 2020 prices had fallen below $2.00—and capital markets continued to tighten across the energy industry for all producers. Furthermore, the value of Debtor's primary assets— working interests in gas-heavy, capital intensive, non-operated wells with longer production curves—have been particularly challenged by the wider energy-market's revaluation of many distressed assets given lower price assumptions. Ultimately, the Debtor was unable to secure prepetition financing on a junior or unsecured basis despite a tireless process that involved contacting more than a dozen lenders.

17. As the Debtor scrambled for additional liquidity, outstanding JIB obligations continued to accrue. By late 2019, many Third-Party Operators had begun to exercise their rights under the applicable Pooling Agreements to offset revenues otherwise due to the Debtor against

the outstanding balance. The Debtor has been caught in a vicious cycle where its ability to pay present invoices is limited by offsets incurred against past-due balances. Certain Third-Party Operators have intensified this pressure by filing liens against the Debtor's assets in the various counties in which the wells were located.

18. In late January 2020, the financial pressure on the Debtor boiled over when the Debtor's largest Third-Party Operator, Continental Resources Inc., initiated a forced forfeiture of Debtor's working interests in certain key wells. Others have followed suit. Warwick-Jupiter, LLC and US Drilling Company, LLC (collectively, "Warwick") have since attempted to effect a similar forfeitures.

19. Furthermore, nearly all of the Debtor's Third-Party Operators have exercised their right under applicable Pooling Agreements to offset their JIB receivables against revenue otherwise payable to the Debtor. Affiliated Operators are also offsetting the outstanding expenses against revenues otherwise due to the Debtor.

20. Debtor owes an estimated $8.8 million in outstanding JIB payments to non-affiliated Third-Party Operators. In addition, the Debtor is approximately $4.5 million in arrears to its Affiliated Operators with respect to its obligations under the MSA. The Debtor faces additional forfeitures and foreclosures unless it is able to pay down its outstanding JIBs.

21. Given the risk to the Debtor's business and the lack of available prepetition liquidity, the Debtor retained restructuring advisors Opportune LLP ("Opportune") and Bracewell LLP in February as it began actively pursuing restructuring alternatives including post-petition financing.

22. The forfeiture of the Debtor's participatory working interests in the key Continental wells, in addition to the loss of revenue due to offsets from the Third-Party Operators has had a

debilitating effect on the Debtor's going concern value and threatened the Debtor's ability to meet ongoing obligations. The Debtor faces further liens and forfeitures absent the liquidity required to clear these arrearages and restore its interests and revenue stream. After consultation with its advisors, the Debtor determined that restructuring its business would maximize value for its stakeholders over and above a foreclosure sale. Consequently, the Debtor initiated this chapter 11 proceeding.

## V.  THE DEBTORS EFFORTS TO OBTAIN POST-PETITION FINANCING

23. The Debtor's immediate need for liquidity has been driven by its need to fund ongoing JIB payments, thereby preserving the value of the estate and its business as a going concern.

24. The Debtor had previously made extensive efforts to canvass lenders and secure prepetition financing on a junior, unsecured, superpriority basis. When these efforts failed, the Debtor turned to additional negotiations for additional capital provided by prepetition lenders TCB and HPS in late January and early February 2020. The Debtor initially attempted to negotiate a debtor in possession facility with HPS. However, after an extensive bargaining process, the Debtor was unable to reach an agreement on terms acceptable to all parties. The Debtor turned to its other pre-petition lender, TCB, and began negotiations that have served as the basis for the currently contemplated $8.5 million debtor in possession facility ("DIP Facility") provided on a priming basis.

25. In parallel with the above-described discussions, the Debtor and restructuring advisor Opportune have reached out to a number of third-party financial investors to inquire whether such parties would be willing to extend post-petition financing to the Debtor on a junior, unsecured, superpriority, or even a priming basis. Specifically, the Debtor and Opportune have

contacted five parties who routinely provide DIP financing to gauge interest. However, due to market conditions and because the Debtor already has more than $80 million in outstanding in prepetition secured debt outstanding, the Debtor was unable to locate post-petition financing other than the DIP Facility.

26. Furthermore, the Debtor and its advisors have worked fervently to improve the post-petition financing proposal received from TCB. In agreeing to the TCB DIP Facility, the Debtor put a premium on a financing that allowed the company the ability to conduct an organized 363 sale process in order to preserve the value of the estate. Given the current dislocation of the market, the Debtor strongly believes that, in its business judgment, an expedited sales process is the best path for maximizing value for all stakeholders.

## VI. FIRST DAY PLEADINGS

**Notice of Designation as Complex Chapter 11 Bankruptcy Case**

27. The Debtor believes that this chapter 11 Case qualifies for treatment as a complex chapter 11 case under the Procedures for Complex Chapter 11 Cases in Texas Bankruptcy Courts because (i) its total debt exceeds $10 million, (ii) there are more than 50 parties-in-interest in this case, and (iii) its business contains a certain amount of complexity described above. As a result, the Debtor has a significant need for simplification of noticing and hearing procedures to reduce delays and expenses.

**Emergency Motion of Debtor for Order (I) Authorizing (A) Maintenance of Existing Bank Accounts and Cash Management System and (B) Continued Use of Existing Business Forms and Records; (II) Waiving the Requirements of 11 U.S.C. § 345(B); and (III) Granting Related Relief**

28. By the Cash Management Motion, the Debtor seeks entry of an order

      (i)      Authorizing the Debtor to continue to use its existing business forms and records;

      (ii)     Authorizing the Debtor to maintain its existing bank accounts and cash management system; and

      (iii)    Waiving the Debtor's obligation to comply with the requirements set forth in § 345(b) of the Bankruptcy Code.

29. The Debtor utilizes a cash management system that provides well-established and efficient mechanisms for the collection, concentration, management, and disbursement of funds used in its operations (the "Cash Management System"). The Debtor's Cash Management System constitutes an ordinary course, essential business practice providing significant benefits to the Debtor including, among other things, the ability to (i) control funds, (ii) ensure the availability of funds when necessary, and (iii) reduce costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information. Each of the bank accounts described in the Cash Management Motion are at Texas Capital Bank, N.A., a UST authorized and approved depository. Any disruption of the Cash Management System could have a severe and adverse impact upon the Debtor's reorganization efforts.

30. In addition to the bank accounts, the Debtors utilize multiple electronic and physical business forms in the ordinary course of their business, including, but not limited to, letterhead on invoices and stationary, and computer-printed checks (the "Business Forms"). By virtue of the nature and scope of the business in which the Debtor is engaged and the numerous other parties with whom it deals, the Debtor needs to use its existing business forms without alteration or change.

31. To avoid any adverse impact upon the Debtor's reorganization efforts, minimize expenses to the Debtor's estate, and avoid confusion on the part of the Debtor's customers, vendors, and suppliers during the pendency of the chapter 11 cases, I request that the Court

authorize the Debtor to maintain its current bank accounts and Cash Management System and to continue to use all physical and electronic Business Forms.

**Debtor's Emergency Motion for Order Authorizing the Debtor to Pay or Honor Prepetition Joint Interest Billing Obligations to Oil and Gas Operators**

32. As explained herein and described more fully in the JIB Motion, the Debtor contracts with certain Third-Party Operators under the Pooling Agreements. The Debtor is currently $8.8 million in arrears on such obligations. As a result, certain Third-Party Operators have exercised rights under the applicable Pooling Agreements to (i) to treat the Debtor as a nonparticipating party in the unit once JIBs fall into arrears and (ii) offset revenue otherwise due to the Debtor against outstanding JIBs.

33. The Debtor submits that payment of the key delinquent prepetition JIBs is in the best interests of the Debtor, its estate, and all parties-in-interest. The Debtor expects that paying certain of the JIB obligations will immediately boost the value of the estate. Many of the affected wells are near payout or about to yield positive production revenue. Accordingly, other producers may lien or continue to offset the Debtor's production revenues.

**Debtor's Emergency Motion for Order Authorizing the Debtor to Continue Payments Under Prepetition Services Agreement on a Postpetition Basis in the Ordinary Course of Business**

34. As explained herein and described more fully in the MSA Motion, the Debtor maintains a relationship with Affiliated Operators pursuant to the MSA. Under the MSA, the Affiliated Operators provide certain services to the Debtor *at cost*, including: (i) general and administrative services, land administration, field operations, technical services, and the supervision of outside professionals provided by Echo Energy and (ii) elections under operating agreements, the discharge of the Debtor's obligations under applicable operating agreements, and the marketing and sale of hydrocarbons provided by Echo E&P.

35. The Debtor is currently $4.5 million in arrears with respect to its MSA obligations. Debtor's failure to timely make required payments to Affiliated Operators under the MSA may cause Affiliated Operators to cease providing the services under the MSA. Such cessation would materially jeopardize the ability of the Debtor to operate as a going concern. For example, Affiliated Operators would cease to (i) provide personnel for the physical operation of equipment and facilities relating to properties owned by the Debtor, (ii) perform services necessary to market and sell the hydrocarbons produced from the oil and gas property interests owned by the Debtor, and (iii) provide the Debtor with other general and administrative services necessary for the conduct of its business, including accounting, auditing, billing, corporate record keeping, treasury services, etc.

36. Furthermore, if the Debtor is unable to receive the services of Affiliated Operators under the MSA, third parties (e.g. oil and gas field service providers) may be unwilling or unable to conduct business with the Debtor. The Debtor will be burdened with locating an alternative operator and alternative vendors, which is likely to be more expensive and disruptive than allowing the Debtor to continue payments under the MSA in the ordinary course of business.

37. Because the services provided by the Affiliated Operator pursuant to the MSA are such an integral part of the Debtor's operations, and noting that the services are provided at cost, the Debtor respectfully requests that the Court approve the relief requested in the MSA Motion.

**Debtor's Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtor to (A) Obtain Priming and Superpriority Post-petition Financing and (B) Use Cash Collateral, (ii) Granting Adequate Protection, (iii) Scheduling a Final Hearing and (iv) Granting Related Relief**

38. The Cash Collateral Motion seeks the entry of an interim order, substantially in the form attached to the Cash Collateral Motion: (i) authorizing the Debtor to (a) obtain secured post-petition financing on a priming and superpriority basis (the "DIP Facility") and (b) use Cash

Collateral (as defined below), (ii) granting adequate protection, (iii) scheduling a hearing (the "Final Hearing") to consider entry of the Final Order, and (iv) granting related relief.

39. As described in more detail in the Cash Collateral Motion, the Debtor seeks immediate access to up to $8.5 million from the debtor in possession financing facility that it has secured from certain DIP Lenders. This liquidity is required to ensure the Debtor is able to continue operating during this chapter 11 Case and to preserve the value of the Debtor's estate for the benefit of all parties in interest. The Debtor filed this chapter 11 case because it cannot meet its near-term operating expenses. The Debtor would be forced to cease operations immediately absent additional liquidity.

40. Through the DIP Facility, the Debtor will have access to the necessary funding to: (a) continue the day-to-day operation of its business; (b) fund the expenses necessary to preserve the value of its oil and gas interests; and (c) fund this chapter 11 Case.

41. The DIP Facility also serves a larger purpose for the Debtor. The immediate access to $8.5 million of cash and the additional liquidity made available under the DIP Facility signals to the Debtor's operators and its indirect (i.e. via its operators) vendors, suppliers, and customers that the Debtor will continue to meet its commitments during this chapter 11 Case. Many operators of the oil and gas wells in which the Debtor owns an interest have not been paid for an extended period of time and have exercised their contractual rights against the Debtor's incomes from, and interests in, affected wells. Moreover, the Debtor believes the DIP Facility is in the best interests of the estate because it is the Debtor's best option and will allow the Debtor an opportunity to protect key assets and proceed to an orderly sale, as opposed to being forced into a quick fire sale.

42. Because the liquidity provided by the DIP Facility is essential to preserving the Debtor as a going concern, the Debtor respectfully requests that the Court approve the relief requested in the Cash Collateral Motion.

## Conclusion

43. Approval of the First Day Motions is in the best interest of the Debtor, its estate and its creditors.

44. I have reviewed this Declaration and hereby declare under penalty of perjury that the foregoing is true and correct and within my own personal knowledge.

Executed this 1st day of April, 2020.

-------/s/ *Gregg Laswell*------------------
Gregg Laswell
Proposed CRO, Echo Energy Partners I, LLC